UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JANE POE, JOHN DOE, ROBERT ROE,
MARK MOE, LARRY LOE, DEGAGE
MINISTRIES, and MEL TROTTER
MINISTRIES,

      Plaintiffs,

v.                                      Case No.  1:10-CV-318

RICK SNYDER, Governor of the State      HON. GORDON J. QUIST
of Michigan, BILL SCHUETTE, Attorney
General of the State of Michigan,
KRISTE ETUE, Director of the Michigan
State Police, WILLIAM FORSYTH, Kent
County Prosecutor, in their official
capacities,

      Defendants.
_____/

## OPINION

      Plaintiffs, five individuals with prior criminal sexual conduct ("CSC") convictions, who are either currently homeless or have been so in the past, and two non-profit, charitable organizations that operate overnight shelters for homeless persons in Grand Rapids, Michigan, seek declaratory and injunctive relief concerning application of the residency restrictions of Michigan's Sex Offender Registration Act ("SORA" or the "Act"), M.C.L.A. § 28.721, *et seq.* to emergency overnight shelters.  Plaintiffs have sued Rick Snyder, the Governor of Michigan, Bill Schuette, the Michigan Attorney General, and Colonel Kriste Etue, the Director of the Michigan State Police (collectively the "State Defendants")[1], as well as William Forsyth ("Forsyth"), the Kent County Prosecutor, all in their official capacities.  Plaintiffs filed their complaint in response to the death of Thomas Pauli,

---

[1] Defendants Snyder, Schuette, and Etue have been substituted in place of their predecessors, Jennifer Granholm, Michael Cox, and Eddie L. Washington, pursuant to Fed. R. Civ. P. 25(d).  (Dkt. # 56.)

a homeless man with a prior CSC conviction who froze to death on the street in Grand Rapids. Pauli was forced into the freezing cold after an overnight shelter located within 1,000 feet of a school denied him admission because of his status as a registered sex offender. Like Pauli, the individual plaintiffs, identified in the pleadings as Jane Poe, John Doe, Robert Roe, Mark Moe, and Larry Loe, are all subject to SORA as a result of their CSC convictions.

Plaintiffs, the State Defendants, and Forsyth have all filed motions for summary judgment. For the reasons set forth below, the Court will grant Plaintiffs' motion in part and deny Defendants' motions. The Court will issue its declaratory judgment as to the meaning of "reside" as defined in the Student Safety Zone provisions of SORA, but will deny injunctive relief.

## I. BACKGROUND

### A. SORA's Registration and Residency Provisions

Pursuant to SORA, individuals who have been convicted of certain listed sexually-related offenses are required to comply with the Act's registration and reporting requirements. M.C.L. §§ 28.723-25. When registering, the offender must provide, among other things, his or her address and a summary of convictions for the listed offenses. M.C.L. § 27.727(a) & (b). In addition to registering, an offender is required to periodically report to the local law enforcement agency "for verification of domicile or residence," and to notify the local law enforcement agency within 10 days after the offender changes his or her residence or domicile. M.C.L. §§ 29.725(1), 29.725a(4).

An individual subject to SORA must also comply with the "Student Safety Zones" provisions, which were incorporated into SORA effective June 1, 2006. M.C.L. §§ 28.733-28.736. In particular, subject to certain exceptions not relevant here, a registered sex offender "shall not reside within a student safety zone." M.C.L. § 28.735(1). SORA defines a "student safety zone" as "the area that lies 1,000 feet or less from school property." M.C.L. § 28.733(f). The Student Safety Zone provisions of SORA do not define the term "reside" as used in M.C.L. § 28.735(1). A

registered sex offender who violates § 28.735(1) is subject to criminal liability, with the first offense being a misdemeanor punishable by not more than one year imprisonment and subsequent offenses being a felony punishable by not more than two years imprisonment. M.C.L. § 28.735(2). These provisions are the root of the instant case.

All parties in this case agree that the definition of "residence" in SORA's registration requirements cannot be the same as "reside" in the Student Safety Zone provisions of SORA. Considering the breadth of Michigan Supreme Court's scope of "residence" in *People v. Dowdy*, 489 Mich. 373, 802 N.W.2d 239 (2011) and M.C.L. § 28.722(g), the definition in *Dowdy* and the code would virtually amount to banishment.

**B.     The Plaintiffs**

Plaintiff Mel Trotter Ministries is a non-profit, charitable organization that provides various services to homeless persons in Grand Rapids, including an overnight shelter for men. (Merchut Aff. ¶ 1.)[2] Mel Trotter Ministries is located within 1,000 feet of a school. Men who sleep at Mel Trotter must arrive by 7 p.m. in the evening and depart the facility by 7 a.m. the next morning. (*Id.* ¶ 7.) Homeless men who stay overnight at Mel Trotter are permitted to bring a limited number of personal possessions with them to the shelter in a plastic bag or small backpack, but they must take their property with them when they leave the next morning. (*Id.* ¶ 9.) There is no limit on the number of nights men may stay at Mel Trotter, but there is also no guarantee that they will be able to stay there on any given night because beds are assigned on a first-come/first-served basis and admission can be denied for lack of room or other reasons. (*Id.* ¶ 11.) Until recently Mel Trotter had believed that registered sex offenders could not stay overnight at its shelter because of the Student Safety Zone legislation. Mel Trotter personnel thus generally denied admission to homeless

---

[2]Unless otherwise noted, all exhibits are attached to the individual Plaintiffs' motion for summary judgment. (Dkt. #59.)

individuals if they were aware that such individuals were subject to sex offender registration. (*Id.* ¶ 4.)

Plaintiff Degage Ministries is a non-profit, charitable organization that provides services to homeless persons in Grand Rapids, including an overnight drop-in center for women. Degage Ministries' facility is located within 1,000 feet of a school. (Palmerlee Aff. ¶¶ 1, 3.) The drop-in center is available for overnight stays from 8 p.m. to 8 a.m. (*Id.* ¶ 7.) Like Mel Trotter, women who sleep overnight are permitted to bring a limited number of personal items, but they must take their belongings with them when they leave the next morning. (*Id.* ¶ 9.) Unlike Mel Trotter, Degage Ministries rents lockers to homeless men and women, although space is limited. Thus, some individuals who sleep overnight may not have locker space, while some individuals who have rented lockers may sleep on the street or at another agency. (*Id.* ¶¶ 10-11.) There is no limit on the number of nights a woman may stay, but room is limited and there is no guarantee that space will be available on any particular night. (*Id.* ¶ 12.) Until recently, Degage had believed that sex offender registrants could not stay at its shelter and thus denied such persons admission if their sex offender status was known. (*Id.* ¶ 4.)

Plaintiffs Poe, Doe, Roe, Moe and Loe each has a prior conviction that subjects him or her to the requirements of SORA, including the prohibition of residing within 1,000 feet of a school. They are now, or have been, homeless and have previously used the emergency shelter services offered by Mel Trotter, Degage Ministries, and/or Guiding Light Mission, a shelter that is not a plaintiff in this case but is located within 1,000 feet of a school.

Jane Poe, who is approximately 23 years old and has mental and emotional impairments, was convicted of a misdemeanor CSC charge when she was 20 years old. She is not able to hold a job and has no money to pay for a place to stay. (Poe Aff. ¶¶ 3-4.) Poe states that she has been raped and beaten up in the past and is afraid to be on the streets. (*Id.* ¶ 5.) Poe stays at different places–

4

including with friends, at Degage Ministries, and on the street." (*Id.*) Poe is concerned that if she cannot stay at a shelter, she may have no place to go and could suffer the same fate as Mr. Pauli. (*Id.* ¶¶ 14-15.)

John Doe was convicted of a sex offense approximately 20 years ago. Doe is currently homeless and in the past has stayed in various shelters and with friends. (Doe Aff. ¶¶ 4-5.) Doe rents a locker at Degage Ministries but does not stay there. In August 2009, the Grand Rapids Police told Doe that he could not use Guiding Light Ministries as his registration address because it was within 1,000 feet of a school. (2d Doe Aff. ¶ 6.) After seeking legal advice, Doe sought to register as homeless, but the police told him that he had to give an address and that the address could not be a shelter address as they are all located within 1,000 feet of a school (*Id.* ¶¶ 7-8.) Doe then moved to Ann Arbor to stay in a shelter that was located outside a school safety zone. When Doe returned to Grand Rapids for his belongings, however, he was arrested and prosecuted for failing to register. (*Id.* ¶ 10.) Although Doe's counsel advised Doe that he had a good defense, Doe chose to plead guilty because he would have had to remain in jail until the case went to trial and he could not have afforded bond. (*Id.* ¶¶ 12, 14-16.) Given this prosecution, Doe is afraid of being prosecuted for sleeping in a homeless shelter without a ruling that it is legal for him to do so. (*Id.* ¶ 20.)

Robert Roe was convicted of fourth degree CSC in 2001. He had been staying at the Battle Creek Veterans Administration Home but had to leave because he was on the sex offender registry. (Roe Aff. ¶ 6.) Roe moved to Grand Rapids in 2009 to find work. He initially stayed at Guiding Light Mission but left in December 2009 after the police told him that he would be prosecuted if he continued to sleep there. (*Id.* ¶¶ 7, 10.) Roe ended up renting a room for $225 per month, which is almost all of the $270 in disability benefits he receives each month. (*Id.* ¶ 11.) Roe is concerned about becoming homeless again if he cannot pay his rent and believes that there is a very real probability that he will end up homeless again. (*Id.* ¶¶ 12-13; 2d Roe Aff. ¶ 7.)

5

Larry Loe, who was 23 years old at the time he signed his first affidavit, was convicted of third degree CSC in 2006, when he was age 19. (Loe Aff. ¶¶ 2, 3.) Loe is currently homeless and has been sleeping at Guiding Light Mission. (*Id.* ¶ 6.) Loe attempted to register with the Grand Rapids Police Department using Guiding Light Mission's address. He was advised that he could not use that address and that he would be prosecuted if he continued to use Guiding Light Mission after April 7, 2010. (*Id.* ¶ 6.) Loe had abdominal surgery in March 2010. Following his release from the hospital, Loe obtained assistance from a social services agency to ensure that he could continue to stay at Guiding Light Mission while he recovered. The agency referred Loe to Legal Aid of Western Michigan. (*Id.* ¶ 9.) His attorney wrote to the prosecutor, Forsyth, asking that Loe be allowed to continue sleeping at Guiding Light Mission, but Forsyth declined to give permission, stating that "absent a change in the law or the issuance of an injunction, I am not willing to allow [Loe] to violate the law by continuing to sleep at Guiding Light Mission." (*Id.* ¶ 10; letter of 3/31/10 from Aukerman to Forsyth; letter of 4/5/10 from Forsyth to Aukerman.) Loe apparently continues to use the shelters, but is fearful that he will be prosecuted. (Loe Aff. ¶ 12; 2d Loe Aff. ¶ 8.) Loe fears that if the shelters learn that he is on the sex offenders registry, they will not allow him to stay there, leaving him nowhere else to stay. (2d Loe Aff. ¶¶ 7, 8.)

C. **Procedural History**

In November 2009, Plaintiffs, various homeless advocacy organizations, and the Grand Rapids Police Department requested a declaratory ruling from the Michigan State Police as to whether SORA's residency restrictions apply to homeless registrants staying at overnight emergency shelters, but the Michigan State Police declined to issue a ruling. Thereafter, Plaintiffs filed a complaint in the Ingham County Circuit Court alleging three claims which sought: (1) a declaration that registered sex offenders accessing overnight shelters do not "reside" at the shelter for purposes of SORA's residency restrictions; and (2) alternate declarations that the Student Safety Zone

6

Provisions violate both federal and state constitutional prohibitions on cruel and/or unusual punishment and ex post facto punishment if the Student Safety Zone Provisions are interpreted to preclude homeless sex offenders from accessing overnight shelters. Plaintiffs also requested injunctive relief. Defendants removed the case to this Court on the basis of federal question jurisdiction. On June 1, 2010, this Court denied Plaintiffs' motion to remand the state law claims to state court. Plaintiffs then filed a motion for preliminary injunction. Although the Court held a hearing, it did not decide the motion. Instead, on November 23, 2010, the Court entered a stipulated order staying the proceedings pending a decision by the Michigan Supreme Court in *Dowdy*. The Michigan Supreme Court has decided *Dowdy*, but its decision does not resolve this case. Therefore, the parties have moved for summary judgment.

## II. DISCUSSION

In their motion for summary judgment Plaintiffs request a declaratory judgment that individuals subject to SORA's registration and reporting requirements may sleep overnight in, or spend multiple nights in, homeless shelters or drop-in centers located within 1,000 feet of a school without violating SORA's residency restrictions. Plaintiffs also request a permanent injunction barring enforcement of SORA's residency restrictions with regard to their use or operation of overnight shelters. The State Defendants argue that they are entitled to summary judgment because Plaintiffs lack standing and their claims are not ripe. All Defendants contend that SORA's residency restrictions do not constitute punishment under the United States Constitution or the Michigan Constitution and thus constitute neither cruel and/or unusual punishment nor ex post facto punishment. Finally, Defendant Forsyth argues that he should be dismissed because, as a county prosecutor, he is effectively an agent of the state and thus, is not a necessary party given that he will be bound by judgment issued against the State Defendants.

7

A.     **Justiciability Requirements**

1.     **Individual Plaintiffs**

*Standing*

The State Defendants argue that the individual Plaintiffs' claims must be dismissed because Plaintiffs lack Article III standing.[3] Defendants contend that Plaintiffs have failed to show through their affidavits and other materials a well-ground fear of prosecution under SORA. Defendants also contend that Plaintiffs' present circumstances fail to show actual present harm or a substantial possibility of future harm.

Pursuant to Article III of the United States Constitution, federal courts have the power to hear "cases" or "controversies." *See Fieger v. Mich. Supreme Ct.*, 553 F.3d 955, 961 (6th Cir. 2009). The "case-or-controversy limitation is crucial in maintaining the tripartite allocation of power set forth in the Constitution." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341, 126 S. Ct. 1854, 1861 (2006) (internal quotation marks and citations omitted). Standing is one of several principles used to ensure compliance with the case or controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992). "Standing is the 'threshold question in every federal case.'" *Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 832 (6th Cir. 2001) (quoting *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999)). To satisfy the standing requirement, "a plaintiff in federal court must allege such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d

---

[3] Defendants do not argue that Plaintiffs fail to satisfy recognized prudential limitations on standing. Recognized prudential limitations require that the Plaintiff must suffer the type of injury that the constitutional provision protects. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475, 102 S. Ct. 752, 760(1982). There is no question that the individual Plaintiffs, who are or have been homeless, satisfy this requirement.

8

710, 715 (6th Cir. 1995) (internal quotation marks and citations omitted). The Supreme Court has established the following test for Article III standing:

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81, 120 S. Ct. 693, 704 (2000) (citing *Lujan*, 504 U.S. at 560-61, 112 S. Ct. at 2136).

The State Defendants argue that Plaintiffs lack standing because they fail to allege a concrete injury that this Court can redress. They point out that some Plaintiffs, including Roe and Doe, are no longer in need of emergency overnight shelter assistance in the Grand Rapids area because they no longer reside in Grand Rapids or have found more permanent housing located more than 1,000 feet from a school. The State Defendants also note that Loe, while presently homeless in Grand Rapids, indicates that he stays at Guiding Light Mission, which is not a plaintiff in this case. The State Defendants further contend that Plaintiffs fail to show an injury that is actual or imminent because none of them has been arrested or prosecuted for violating the residency restrictions, and Plaintiffs' evidence of threatened enforcement relates to violations of SORA's registration requirements rather than its residency restrictions.

Plaintiffs have shown a significant possibility of future harm that is not merely speculative. All of the individual Plaintiffs have shown that they are currently using, or have used in the past, services of an emergency homeless shelter located in a school safety zone. For example, Poe stays with friends, on the streets, or at Degage Ministries; Loe lives on the streets and has been staying at Guiding Light Mission–an emergency shelter that operates in the same manner as Mel Trotter and Degage Ministries. (Roe Aff. ¶ 8.) Even though some Plaintiffs have found more permanent housing, it is likely that Plaintiffs will need the services of an emergency overnight shelter in the

9

future.  Unlike the plaintiffs in *Defenders of Wildlife*, who had no immediate intentions to return to places they had once visited and could not easily make such trips to those distant places without some future planning, *Defenders of Wildlife*, 504 U.S. at 563-64, 112 S. Ct. at 2138, Plaintiffs in the instant case cannot plan their need for emergency shelter; one does not plan to be homeless. Moreover, given the nature of homelessness, (*see* 2d Palmerlee Aff. ¶ 11 (noting that "homeless individuals vary greatly in how, when and under what circumstances they utilize emergency shelter services")), Plaintiffs' future need for emergency shelter is not speculative; in spite of global warming, Michigan still has cold winters.  Plaintiffs have also shown that because of the uncertainty regarding the application of SORA's residency restrictions to emergency homeless shelters, they face the impossible choice of staying at a shelter and risking prosecution or sleeping on the streets, where they face physical harm or abuse or, as in the case of Mr. Pauli, death from freezing temperatures.  These are the quintessential circumstances for which declaratory relief is intended – "where the plaintiff is put to the Hobson's choice of giving up an intended course of conduct which he believes he is entitled to undertake or facing possible severe civil or criminal consequences if he does undertake it." *Okpalobi v. Foster*, 244 F.3d 405, 435 (5th Cir. 2001) (internal quotations omitted).

The fact that no Plaintiff or any other person has been arrested or prosecuted for a residency violation arising from the use of an emergency overnight shelter does not deprive Plaintiffs of standing.  Instead, as the Supreme Court has made clear, a credible threat of prosecution is enough:

> When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 2309 (1979) (quoting *Doe v. Bolton*, 410 U.S. 179, 188, 93 S. Ct. 739, 745 (1973)); *see also Medimmune, Inc.*

*v. Genentech, Inc.*, 549 U.S. 118, 128-29, 127 S. Ct. 764, 772 (2007) ("Our analysis must begin with the recognition that, where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced." (footnote omitted)). As the First Circuit has observed: "A credible threat of imminent prosecution can injure the threatened party by putting her between a rock and a hard place–absent the availability of preenforcement review, she must either forego possibly lawful activity because of her well-founded fear of prosecution, or willfully violate the statute, thereby subjecting herself to criminal prosecution and punishment." *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (1st Cir. 1997) (citing *Babbitt*, *supra*); *see also Gordon v. Bowles*, 153 F.2d 614, 616 (Emer. Ct. App. 1946) ("The complainant need only show that his position is jeopardized by the statute, regulation or order, and thereupon the court will afford relief for any uncertainties with respect to this rights."). Here, Plaintiffs have demonstrated a credible threat of prosecution. For example, the Grand Rapids Police Department advised Roe that he would be arrested if he continued to stay at a shelter. (2d Roe Aff. ¶¶ 3-6.) Moreover, at least two Plaintiffs have received written warnings that charges would be sought "for a residency violation of the Sex Offender – School Safety Zone" if they failed to stop using homeless shelters. Although Defendants claim that these warnings were issued because Plaintiffs registered a temporary shelter as their address, not because they used the shelter's temporary services, the warnings at least suggest that usage of a shelter would result in a residency violation. Finally, Loe's counsel sought assurances from Forsyth that Loe would not be prosecuted if he continued to sleep at Guiding Light Mission while he was recovering from his surgery, but Forsyth was unwilling to give such assurances, stating that he was "not willing to allow [Loe] to violate the law by continuing to sleep at the Guiding Light Mission." Such a statement suffices to show actual present harm and a significant possibility of future harm arising from the possibility of criminal prosecution.

Also pertinent here is the fact that Defendants have never disavowed enforcement of SORA's residency restrictions to persons who utilize overnight emergency shelters on a night-by-night basis. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393, 108 S. Ct. 636, 643 (1988) ("We are not troubled by the pre-enforcement nature of this suit.  The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *Hayes v. City of Urbana*, 104 F.3d 102, 103-04 (7th Cir. 1997) (noting that "[t]he City Attorney has not announced that the amended ordinance is a dead letter, never to be enforced," and that an equivocal affirmation of non-prosecution fails to deprive a plaintiff of Article III standing).  Here, while Defendants have made numerous statements in both their briefs and at oral argument tending to suggest that they would not enforce SORA's residency restrictions against Plaintiffs for using overnight shelters, these equivocal statements cannot be accepted as a disavowal; "the government's disavowal must be more than a mere litigation position." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010).

Next, Plaintiffs must show that the harm is traceable to Defendants.  Defendants contend that there is no actual enforcement of SORA originating from the Governor, the Attorney General, or the Michigan State Police.  Each Defendant, however, has some responsibility for the enforcement of Michigan's laws.  Defendant Forsyth, as the Kent County Prosecutor, is responsible for prosecuting violations of Michigan laws, including the provisions of SORA.  *See McNeilus Truck & Mfg., Inc. v. Ohio*, 226 F.3d 429, 437 (6th Cir. 2000) ("Where there is an imminent threat of enforcement, the Attorney General and all county attorneys are proper defendants.")  Defendant Etue, as the Director of the Michigan State Police, is responsible for the activities of the Michigan State Police, which include maintaining the sex offender registry, registering offenders, and promulgating rules on SORA and guidelines for registration of the homeless.  Plaintiffs have also shown that the Michigan State Police trains law enforcement officers regarding the proper enforcement of SORA.  The Attorney General is responsible for enforcement of Michigan's laws

and is also a proper defendant. *Id.* Similarly, Michigan's Governor is responsible for enforcing Michigan's laws. Mich. Const. Art. 5, § 8. Given this general responsibility, the Governor has sufficient connection with the enforcement of SORA that he is a proper Defendant in this case. *See Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656, 665 n.5 (6th Cir. 1982).

Finally, the asserted injury will be redressed by relief from this Court. "The real value of the judicial pronouncement – what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion–is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*." *Hewitt v. Helms*, 482 U.S. 755, 761, 107 S. Ct. 2672 (1987). A judicial resolution in this case would meet this requirement by allowing Plaintiffs to sleep at homeless shelters without risking prosecution and without risking death or injury by sleeping on the streets in order to avoid prosecution.[4]

### *Ripeness*

Defendants also argue that because Plaintiffs have not suffered the adverse consequences that they fear, and may never suffer prosecution, their claims are not ripe and are merely speculative. The ripeness doctrine "exists 'to ensure that courts decide only existing, substantial controversies, not hypothetical questions or possibilities.'" *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 399 (6th Cir. 2001) (quoting *Dixie Fuel Co. v. Comm'r of Soc. Sec.*, 171 F.3d 1052, 1057 (6th Cir. 1999)). The ripeness doctrine is designed to prevent courts from premature adjudication, or entangling themselves in abstract disagreements. *Ky. Press Ass'n v.*

---

[4] Defendants do not address standing under Michigan law for Plaintiffs' statutory interpretation claim, which is a state law claim. When a federal court exercises jurisdiction over a state law claim, a plaintiff must meet standing requirements under both Article III of the constitution and the applicable state law. *See Mid-Hudson Catskill Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005); *c.f.*, *Aarti Hospitality, LLC v. City of Grove City*, 350 F. App'x 1,6 (6th Cir. 2009). Nonetheless, because Michigan's standing requirements are more liberal than Article III's standing requirements, a finding that Plaintiffs meet Article III standing requirements necessarily means that they have standing under Michigan law. *See Lansing Schs. Educ. Ass'n v. Lansing Bd. of Educ.*, 487 Mich. 349, 362, 792 N.W.2d 686, 694 (2010) (stating that "strictly interpreting the judicial power of Michigan courts to be identical to the federal court's judicial power does not reflect the broader power held by state courts").

*Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006). To determine whether a claim is ripe, a court must ask two questions: "(1) is the claim 'fit[] . . . for judicial decision' in the sense that it arises in a concrete and factual context and concerns a dispute that is likely to come to pass? and (2) what is 'the hardship to the parties of withholding court consideration?" *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc).

Plaintiffs have shown that their claims arise in a concrete factual setting because they have already felt the effects of the statute. All individual Plaintiffs are sex offender registrants subject to SORA's residency restrictions and all Plaintiffs have sought overnight lodging from homeless shelters. Some Plaintiffs have stopped staying in homeless shelters after being advised that they would be prosecuted if they continued to do so. And, several Plaintiffs have indicated that they will be forced to stay on the streets in order to avoid prosecution. The hardship of delay to Plaintiffs, given their circumstances, needs no explication. Moreover, the present circumstances are entirely consistent with the remedy of declaratory relief. As the Sixth Circuit has explained:

> "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. It follows that when neither of these results can be accomplished, the court should decline to render the declaration prayed."

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (quoting E. Borchard, *Declaratory Judgments* 299 (2d ed. 1941)). A ruling here will clarify the law for both Plaintiffs and Defendants and afford relief for Plaintiffs from the uncertainty giving rise to the proceeding–whether, as registered sex offenders, they may access overnight shelters.

### 2. Organizational Plaintiffs

The State Defendants further argue that Mel Trotter and Degage Ministries lack standing because SORA does not apply to them and they are not subject to criminal prosecution. The Court

14

need not address Defendant's standing arguments, however, because only one plaintiff need have standing. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 299 n.11, 99 S. Ct. 2301, 2309 n.11 (1979); *see also Sch. Dist. of City of Pontiac v. Sec'y of the United States Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009) (citing *Clinton v. City of N.Y.*, 524 U.S. 417, 431 n.19, 118 S. Ct. 2091 (1998)). Regardless, the organizational Plaintiffs do have standing because SORA has "perceptibly impaired" their ability to accomplish their missions of providing overnight shelter to homeless persons, which "constitutes far more than simply a setback to [their] abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 1124 (1982).

**B.     Declaratory Judgment**

Plaintiffs raise both a statutory interpretation claim and two as-applied constitutional challenges to SORA's residential limitations. The Court need not, however, reach the constitutional issues. It is a fundamental rule of judicial restraint that a court will avoid reaching a constitutional question if it can decide the issue on a statutory ground. *See Olympic Arms v. Buckles*, 301 F.3d 384, 388 (6th Cir. 2002) (noting "the basic canon of avoiding constitutional questions where possible"); *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 258 (5th Cir. 2010). In the instant case, the Court and the parties agree that the issue can be resolved on a statutory ground.

As previously stated, all parties agree that SORA does not provide a definition of "reside" for purposes of the residency restriction found in M.C.L. § 28.735 (1). Thus, ordinary rules of statutory construction may be applied. First, when considering the language of a statute, a court should accord all non-technical words and phrases their common and ordinary meaning. *McCormick v. Carrier*, 487 Mich. 180, 192, 795 N.W.2d 517, 525 (2010). If the term is not defined in a statute, a court may consult a dictionary as an aid to construction. *Id.* In addition to the plain

15

meaning of words, a court should also consider their "placement and purpose in the statutory scheme." *Id.* Finally, "[i]t is elementary that statutes *in pari materia* are to be taken together in ascertaining the intention of the legislature, and that courts will regard all statutes upon the same general subject-matter as part of one system." *Dearborn Twp. Clerk v. Jones*, 335 Mich. 658, 662, 57 N.W.2d 40 (1953).

The Oxford Dictionaries Online defines "reside" as to "have one's permanent home in a particular place." Oxford Dictionaries Online, http://english.oxforddictionaries.com (last visited Dec. 21, 2011). Similarly, the Merriam-Webster Unabridged Dictionary defines "reside" as "to dwell permanently or continuously; have a settled abode for a time; have one's residence or domicile." Webster's Third New Int'l Dictionary Unabridged (2002), http://unabridged.merriam-webster.com (Dec.. 20, 2011). *See also* Random House Dictionary of the English Language 1638 (2d ed.) ("to dwell permanently or for a considerable time"). In construing the term "reside" in both contracts and statutes, Michigan courts have considered it connotes living somewhere permanently or at least for an extended period of time. *See Home-Owners Ins. Co. v. Brown*, No. 259233, 2006 WL 2085039, at *2 (Mich. Ct. App. July 27, 2006) ("'reside' means 'to dwell permanently or for a considerable time, live'"); *Curry v. Jackson Circuit Court*, 151 Mich. App. 754, 758, 391 N.W.2d 476, 478 (1986) (concluding that the term "resides" as used in the Michigan Freedom of Information Act should be given its legal meaning as "a person's legal residence").

Under the ordinary meaning of "reside," a registrant does not violate SORA's residency restrictions by using an emergency overnight shelter under the following conditions: (1) users are admitted to the shelter in the evening and required to leave in the morning; and (2) users have no expectation of obtaining a place in the shelter on any given night. Therefore, registrants may sleep overnight in homeless shelters or drop-in centers located within 1,000 feet of a school, and may

16

spend multiple nights in such shelters, so long as the foregoing conditions apply.

In rendering declaratory relief, the Court is mindful that it must exercise its discretion cautiously. *W. Am. Ins. Co. v. Miller*, No. 5:09-cv-346-KSF, 2010 WL 1369079, at *2 (E.D. Ky. Mar. 31, 2010). Too often, unintended consequences arise from broad declarations made by a court unaware of specific facts. Therefore, the Court has limited its ruling to those circumstances involved in a registrant's access to a homeless shelter or drop-in center on a night-to-night basis - i.e., the facts presented in the instant case.

## C. Injunctive Relief

Plaintiffs also request a permanent injunction pursuant to Fed. R. Civ. P. 65 against enforcement of M.C.L. § 28.375 as applied to registrants who use emergency shelter services for overnight housing. The Declaratory Judgment Act authorizes courts to issue "[f]urther necessary or proper relief based on a declaratory judgment or decree . . . after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2201.

A plaintiff seeking a permanent injunction must show that "it has suffered irreparable injury, there is no adequate remedy at law, 'that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted,' and that it is in the public's interest to issue the injunction." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct. 1837, 1839 (2006)).

Regarding the likelihood of future harm, although Plaintiffs have demonstrated a need for declaratory relief, the Court has no reason to believe that Defendants will attempt to enforce SORA's residency requirements in a manner inconsistent with the Court's declaratory ruling. In other words, the Court finds no basis to conclude that having obtained declaratory relief, Plaintiffs will continue to face a threat of injury. Although Plaintiffs lack an adequate remedy at law for

future violations, the Court concludes that the risk of future harm is so slight that the lack of an adequate remedy at law is not enough to warrant injunctive relief. As for the balance of hardships and the public's interests, while these factors do favor the requested relief, the Court notes that the State also has an interest in enforcing its laws. Therefore, the Court concludes that injunctive relief is not necessary in this particular case at this particular time.

### III.  CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' motion for summary judgment in part and deny it in part. The Court will grant Plaintiffs' request for declaratory relief but deny Plaintiffs' request for an injunction. The Court will also deny Defendants' motions for summary judgment.

An Order consistent with this Opinion will be entered.


Dated:  December 27, 2011                    /s/ Gordon J. Quist
                                         GORDON J. QUIST
                                         UNITED STATES DISTRICT JUDGE